1
2
3
4
5  UNITED STATES DISTRICT COURT
6  NORTHERN DISTRICT OF CALIFORNIA
7
8  CHRISTOPHER ELDEN WHITE,              No. C 08-3781 SI (pr)
9          Plaintiff,                   **ORDER GRANTING MOTION FOR**
                                        **SUMMARY JUDGMENT**
10     v.
11  DR. JOHN KASAWA, primary
   care physician; et al.,
12
13          Defendants.
   _____/
14
15                          **INTRODUCTION**
16      In this action, former prisoner Christopher White complains about the medical care he
17  received when he was incarcerated at Salinas Valley State Prison in Soledad, California. For the
   reasons discussed below, defendants' motion for summary judgment will be granted and
18  judgment will be entered against plaintiff.
19
20                          **BACKGROUND**
21      In his unverified complaint, White alleged that he was an insulin-dependent diabetic and
22  suffered from a painful nerve condition.  He alleged that Dr. Kasawa (a) stopped his insulin, (b)
23  reduced his Neurontin pain medication, ©) ordered the Neurontin "crushed and floated" when
24  White complained about the reduction in pain medications, and (d) delayed following up on
25  White's request for a cardiac consult.   He alleged that nurse Carnes failed to place White on a
26  doctor's line (i.e., failed to set appointments for him) after hearing White's complaints of pain,
27  cardiac problems, and elevated blood sugars.  White alleged that chief medical officer Dr. Lee
28

(a) failed to properly supervise Dr. Kasawa and nurse Carnes, (b) failed to address White's administrative grievances complaining about their treatment of him, and ©) failed to approve White's request for a cardiac consultation. The court earlier determined that the complaint stated a § 1983 claim against these three defendants for Eighth Amendment violations based on the alleged deliberate indifference to White's medical needs.

The following facts are undisputed unless otherwise noted.

At the relevant times in 2007-2008, White was a prisoner at Salinas Valley State Prison. He is now out of custody.

Dr. Kasawa was White's primary care physician at Salinas Valley from approximately March through October 2007. Dr. Kasawa had been licensed to practice medicine in California since 2001, and had been board-certified in family medicine since 2003. He was employed as a contract physician for the CDCR from approximately February - December 2007.

T. J. Carnes was a registered nurse working at Salinas Valley.

Dr. Lee was the chief medical officer and health care manager at Salinas Valley.

A.      Insulin And The Diabetes Care

White had diabetes. White states that he had type 1 diabetes, but provided no medical documentation to show such a diagnosis.[1] Dr. Kasawa believed White had type 2 diabetes. "The standard of care within the medical community for treatment of Type II diabetes is to first try to control the disease with oral medications. If it cannot be controlled with oral medications alone, insulin is then prescribed." Kasawa Decl., ¶ 3.

White had been taking insulin for an unstated period of time before Dr. Kasawa stopped the insulin in March 2007, and attempted to control the diabetes with other drugs. The insulin was not re-started for White until December 24, 2007. In a declaration, White states that during the time he was denied insulin, his blood sugar levels were "well over 250" on an unstated

---

[1]The document he did submit that suggests he was an insulin-dependent diabetic is a screening form completed by health care staff based on the inmate's answers to questions. See Docket # 29-1 at 7.

2

number of occasions on unstated dates. Docket # 29-14.[2] White states that, when the insulin was stopped, "I started suffering blurred vision, chest pain, feelings of vertigo, and leg pain[.] These condition continued for over a year I complained to Dr. Kasawa, but my complaints fell on deaf ears. I begged Dr. Kasawa to put me back on insulin and he told me 'insulin is not good for you' and refused." Docket # 29-14.

On March 20, 2007, White was brought to the prison medical clinic disoriented and complaining that he was "tripping." Kasawa Decl., ¶ 3, Exh. A at 004. A nurse saw him and assessed that he was hypoglycemic. Dr. Kasawa examined White and noted that he had a blood glucose reading of 21 at about 6:00 a.m. This "was extremely low and life threatening, as normal readings should be between 80-120." Kasawa Decl., ¶ 3. Dr. Kasawa noted that White also had experienced hypoglycemia a day earlier, and that the nurse practitioner therefore had reduced White's insulin. Dr. Kasawa decided to discontinue White's insulin entirely because insulin decreases blood glucose levels. White continued to receive the oral anti-diabetic drugs Rosiglitazone, Metformin (which is also known as glucophage), and Glyburide. Dr. Kasawa scheduled a follow-up appointment in a week.

On March 23, 2007, a nurse practitioner decreased White's Glyburide dosage because he was still experiencing low blood glucose levels in the mornings.

On March 28, 2007, Dr. Kasawa saw White for a follow-up appointment. He discontinued the Glyburide because it could cause glucose levels to drop too low, decreased the Rosiglitazone, and continued the Metformin for White.

On April 4, 2007, White had a follow-up appointment with nurse practitioner Bey. His glucose levels were improved and no change was made to his medications. The chart for that visit showed glucose readings of 113 at 6:00 a.m. and 161 at 3:00 p.m. on April 2, and 110 at 6:00 a.m. and 119 at 3:00 p.m. on April 3. White's weight was listed as 314 pounds on the chart. Kasawa Decl., Exh. A at 011.

On April 23, 2007, Dr. Kasawa discontinued the Rosiglitazone, and continued the

---

[2]The court uses the docket numbers to refer to White's declarations because he submitted six different declarations from himself with his opposition to the motion for summary judgment. One of them, docket # 29-3, was not signed under penalty of perjury and therefore is not admissible evidence.

Metformin for White.

On May 21 or 22, 2007, Dr. Kasawa saw White regarding White's concern that his blood sugar levels had risen. Dr. Kasawa increased the Metformin, but did not resume the insulin because White had demonstrated life-threatening low blood glucose levels while on insulin just two months earlier.

On June 1, 2007, Dr. Kasawa noted that White's blood glucose levels were occasionally high and prescribed Glipizide, an oral medicine that lowers blood glucose levels.

On June 19, 2007, Dr. Kasawa increased the Glipizide when he was notified by nurse Carnes that White's blood sugar levels were increasing.

On June 26, 2007, Dr. Kasawa saw White for a follow-up appointment. He noted that White had not experienced any hypoglycemia episodes since his last visit.

On July 12, 2007, Dr. Kasawa referred White for an urgent podiatry appointment to address a toe infection. According to Dr. Kasawa, a toe infection likely would have been contributing to White's increasing blood sugar levels. Dr. Kasawa also instructed White to speak with his psychiatrist about options for his current anti-psychotic medications because those medicines also could have been increasing his blood sugar levels.

On October 1, 2007, Dr. Kasawa saw White for a regular follow-up exam. They discussed the importance of good nutrition and Dr. Kasawa gave White educational materials about good general health habits. He also told White he need to do more exercise. Increased exercise would help lower his blood sugar levels. Dr. Kasawa continued the oral anti-diabetes medicines but did not prescribe insulin. One side effect of insulin is weight gain. In the six months since White had stopped taking insulin, he lost 32 pounds. At 283 pounds, White still needed to lose more weight, according to Dr. Kasawa.

In October 2007, Dr. Kasawa stopped being White's primary care physician.

On November 13, 2007, Dr. Mack saw White. White requested to be put back on insulin. Dr. Mack did not prescribe insulin then, and instead increased the Glipizide and Metformin.

On December 13, 2007, nurse Carnes discussed White's increased blood sugar levels with a physician, who continued the oral anti-diabetic medications.

On December 24, 2007, Dr. Mack prescribed insulin for White. Dr. Mack discontinued the Glipizide and decreased the Metformin.

B.    Neurontin

Neurontin, also known as gabapentin, is a medication used to treat seizures and nerve pain. It is not a narcotic, but does have the potential for abuse.

Neurontin was prescribed for White during the relevant time period for pain associated with diabetic neuropathy. White was also taking numerous other medications. A list of his medicines on March 19, 2007, listed at least 16 medications for him for a variety of ailments. Kasawa Decl., Exh. A at 002.

On or about May 21 or 22, 2007, Dr. Kasawa decreased White's Neurontin dosage from 800 mg. three times per day to 600 mg. three times per day. Dr. Kasawa states that he did this as part of an effort to try to reduce White's exposure to multiple medications and the possible adverse reactions therefrom by slowly decreasing his Neurontin dosage. Dr. Kasawa scheduled a follow-up appointment in about a week to monitor him on the lower dosage.

Dr. Kasawa saw White on June 1, 2007. Dr. Kasawa states that White did not complain of increased pain, and Dr. Kasawa continued him on the lower dosage of Neurontin.

Dr. Kasawa also saw White again on June 26, and July 12 and 19, 2007. Kasawa states that White did not complain of increased pain from his neuropathy during any of these appointments.

White states that he did complain to Dr. Kasawa of pain on unstated dates.

On August 30, 2007, Dr. Kasawa ordered White's Neurontin crushed and floated. He states that this was done because there was a pending change to the prison's operating procedure concerning the crushing and floating of medications, including Neurontin. The process of crushing and floating medication involves grinding the medication into a powder and placing it in water. Crushing and floating medication is a preventative measure intended to get the right medicine in the right dose to the right person. When medicine is crushed and floated, inmates are less able to conceal it in their cheeks and later abuse or overdose on the medicine, or divert

it to other inmates. Crushing and floating does not change the efficacy or safety of Neurontin.

C.    Cardiac Consult

A "physician request for services" form was completed by nurse practitioner Bey on March 19, 2007. Bey marked the form to indicate that an initial consultation with a cardiologist on an outpatient basis was requested and that the principal diagnosis was "chest pains - SOB/ heart attack 1988." Complaint, Exh. A at 14. Bey did not mark on the form whether the requested service was an emergent, urgent or routine matter.

Another "physician request for services" form was completed by Dr. Mack on December 24, 2007. Dr. Mack wrote that the principal diagnosis was angina, and requested "adenosine thallium," a heart scan. Dr. Mack marked the form to indicate that the procedure was to be done on an outpatient basis and was "routine." The request form was marked "approved" by the U.M. committee on January 2, 2008. Complaint, Exh. A at 13. The consultation was set for May 2, 2008.

White experienced chest pains occasionally. His complaints of chest pain were addressed with nitroglycerine. He also had an EKG on March 5, 2008. Kasawa Decl., Exh. A at 043-045. White also received high blood pressure medicines, such as Lisinopril and hydrochlorothiazide. Lowering his blood pressure would have helped to alleviate his chest pains.

White states in a declaration that, at an unidentified time, Dr. Kasawa "was aware that I had a cardiac (sic) consult pending, however, he failed to address my continued complaints of chest pain and leg pain, and simply told me to get more exercise." Docket # 29-14. In another declaration, White states that he complained on an unidentified date about his chest pain and that he had waited a long time for a cardiac consultation for months, but Dr. Kasawa "refused to even make a phone call to CTC to find out why the consult had not taken place," and said that he was only dealing with blood sugar issues that day. Docket # 29-7 at 5.

On May 2, 2008, White had a cardiology consult and underwent a nuclear cardiology study to examine the blood flow to his heart. The study showed normal results, and the cardiologist did not make any follow-up recommendations. The study was negative for ischemia

1    (i.e., restriction in blood supply), and showed normal left ventricular size and systolic function.

3    D.    Nurse Carnes' Responses To Complaints of Pain And Requests For Care

On June 19, 2007, nurse Carnes notified Dr. Kasawa that White's blood sugar levels had increased. Dr. Kasawa increased White's dosage of Glipizide. Carnes noted that White had a doctor's appointment scheduled in one week. Dr. Kasawa saw White on June 26, 2007.

White submitted a health care services request form dated September 25, 2007, in which he wrote: "(1) I am diabetic and I have a infected left big toe and (2) right shoulder injury." Complaint, Exh. C at 18. His request was reviewed by the triage nurse on September 26, 2007, and his toe was treated in the podiatry department that day. Id. On September 27, 2007, nurse Carnes saw White concerning his complaint of shoulder pain, recommended acetaminophen for pain, and referred him for a routine doctor appointment to occur within fourteen days. Dr. Kasawa saw White on October 1, 2007. The notes of that appointment do not mention shoulder pain, although they do note that the patient reported he did no exercise and the plan for him mentioned his "lifestyle" but was otherwise unreadable. Kasawa Decl., Exh. A at 028.

White submitted a health care services request form dated October 4, 2007, in which he requested services for "rt shoulder pain and right hip lower back." Complaint, Exh. B at 11. The form shows that his request was received by a triage nurse on October 5, 2007. On October 9, 2007, nurse Carnes saw White concerning complaints of shoulder, hip, and lower back pain, ordered naproxen sodium for pain, and contacted Dr. Kasawa. Kasawa Decl., Exh. A at 031-032. Carnes also referred White for a routine doctor appointment. White saw Dr. Mack on November 13, 2007, who ordered an x-ray of the right shoulder. Id. at 034. The parties do not present any evidence whether an x-ray was done and what the result was.

On December 13, 2007, nurse Carnes discussed White's increasing blood sugar levels with a doctor. Nurse Carnes noted that a follow-up appointment with a doctor was scheduled. Dr. Mack saw White on December 24, 2007.

White submitted a health care request form dated February 20, 2008, in which he wrote: "I need to see the doctor regarding my right shoulder. I am in pain all the time now, and this has

7

been going on for several months."  Complaint, Exh. B at 13; Kasawa Decl., Exh. A at 040.

White also submitted a health care request form dated February 21, 2008, in which he wrote:

"My norotin (sic) needs to be refilled.  I was supposed to be seen by the doctor in Jan, and on

Feb. 5th there seems to be a problem getting me in so I can get my meds renewed, among other

things."  Kasawa Decl., Exh. A at 039.  On February 25, 2008, nurse Carnes saw White

concerning the complaints of shoulder pain and request for a renewal of his Neurontin

prescription. Kasawa Decl., Exh. A at 039-041.  Dr. Mack renewed the Neurontin on February

25, 2008, id. at 42, and nurse Carnes noted that White had a follow-up appointment with a doctor

scheduled.

White submitted a health care request form dated March 1, 2008, in which he wrote: "I

need to see the doctor for chest pain, and shoulder pain."  Complaint, Exh. B at 14.    Someone

on the staff wrote a note on the form that his form had been received on March 3, and that the

patient's "only complaint was request to go back to the same regimen, blood sugar check – once

during the day instead of coming early in the morning" and that the person would discuss it with

a doctor who was not present that day.  Id.

White submitted a health care request form dated March 4, 2008, in which he wrote: "I

am requesting to be seen by the doctor for chest pain and right shoulder pain."  Complaint, Exh.

B at 15; Kasawa Decl., Exh. A at 043.  Nurse Carnes wrote that White had chest pain that was

relieved with nitroglycerine and planned to follow up with a doctor.  Id.  Nurse Carnes spoke

with Dr. Lopin, who referred White for an EKG.  An EKG was performed on March 5;

according to the progress notes, White had "normal ECG sinus rhythm."  Kasawa Decl., Exh.

A at 045.

On July 9, 2008, nurse Carnes saw White for his complaints of shoulder, leg, foot, and

back pain.  Nurse Carnes spoke with Dr. Mack, who prescribed Celebrex for White.

On July 24, 2008, nurse Carnes saw White regarding his infected toe.  Nurse Carnes

spoke with Dr. Mack, who prescribed Keflex and made a request for podiatry services.

E.     Dr. Lee

White states that Dr. Lee "reviewed request for medical outside consultation for a cardiologist" that had been done on March 19, 2007 by nurse practitioner Bey. Opposition, p. 15. White also states that Dr. Lee knew of his medical needs by virtue of White's inmate appeals to which Dr. Lee had signed the responses.

Dr. Lee signed the second level response to inmate appeal log # SVSP-A-07-04204 on December 11, 2007. Docket # 29-1 at 15.   In that inmate appeal, White had complained that Dr. Kasawa discontinued his insulin, reduced his Neurontin, and ordered the Neurontin crushed and floated when White complained.  White requested that he be seen by a diabetic specialist, as he apparently had been earlier in his incarceration.  The response that Dr. Lee signed described the first level review investigation and conclusions (i.e., that White's condition was being monitored through regular blood sugar level checks and through enrollment in the Chronic Care Program; and that his provider was responsible for his medical needs and would determine the course of treatment and request necessary tests).  The second level review response was that a referral to a specialist was not medically indicated and therefore was denied; that there was not an order for Gabapentin (Neurontin) and therefore it would not be issued; that the "crush and float" policy applied to all drugs of potential abuse that were not sustained release drugs, and that the policy could not be challenged in the administrative appeal process. White also had been informed at the first level review that he could request to be provided with an alternative medicine that did not fall under the crush and float policy (but there is no evidence he ever pursued that solution).

Dr. Lee signed the second level response to inmate appeal log # SVSP-A-07-05071 on January 31, 2008.  Docket # 29-2 at 7-9.  In that inmate appeal, White had complained that, among other things, he twice requested medical services and was placed on the doctor's line, but never had a doctor's visit.  In appealing to the second level, White complained that he had not been seen for his chest pain and that his cardiac consult had never happened.  The response stated that there was a pending referral appointment with a cardiologist for a service called adenosine thallium.  It had been submitted as a routine referral on December 24, 2007, and

9

1   followed a March 19, 2007 referral to a cardiologist for chest pains and shortness of breath.

2   There was no explanation as to why the first request for a cardiologist consultation had not been

3   processed.   The response also stated that White's request to be seen by a doctor had been

4   addressed in that, after submitting his appeal, he was seen by his primary care provider on

5   November 13, 2007 for follow-up care for his increased blood sugar levels. The response further

6   stated that White had been seen in the chronic care program clinic on June 26, 2007 and

7   December 24, 2007 for chronic care issues, and was scheduled for another visit on February 5,

8   2008.

9       White filed an inmate appeal on April 25, 2008, "addressed to Dr. Lee" in which he

10  complained about the delay getting his cardiologist consultation.  Docket # 29-9 at 2.  Dr. Lee

11  signed the second level appeal response on June 4, 2008, by which time White had already had

12  undergone the cardiac test that came back normal.

13

14                          **VENUE AND JURISDICTION**

15      Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because

16  the events or omissions giving rise to White's complaint occurred at a prison in Monterey

17  County, located in the Northern District.  See 28 U.S.C. §§ 84, 1391(b).  This Court has federal

18  question jurisdiction over this action under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331.

19

20                   **LEGAL STANDARD FOR SUMMARY JUDGMENT**

21      Summary judgment is proper where the pleadings, discovery, and affidavits show that

22  there is "no genuine issue as to any material fact and [that] the moving party is entitled to

23  judgment as a matter of law."  Fed. R. Civ. P. 56©).  A court will grant summary judgment

24  "against a party who fails to make a showing sufficient to establish the existence of an element

25  essential to that party's case, and on which that party will bear the burden of proof at trial . . .

26  since a complete failure of proof concerning an essential element of the nonmoving party's case

27  necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

28  (1986).  A fact is material if it might affect the outcome of the suit under governing law, and a

dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Generally, as is the situation with defendants' challenge to the Eighth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. <u>See Schroeder v. McDonald</u>, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, the complaint was not verified, and therefore is not considered as evidence for purposes of deciding the motion.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. <u>See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. <u>Id.</u> at 631.

## DISCUSSION

Deliberate indifference to a prisoner's serious medical needs amounts to the cruel and unusual punishment prohibited by the Eighth Amendment. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met:

(1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). Accordingly, evaluating a claim of deliberate indifference necessitates examining "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Id. (quoting Estelle, 429 U.S. at 104). A prison official exhibits deliberate indifference when he or she knows of and disregards a substantial risk of serious harm to inmate health. See Farmer, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he or she must actually draw that inference. Id. A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Where doctors have chosen one course of action and a prisoner-plaintiff contends that they should have chosen another course of action, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

A.      Serious Medical Needs?

        The Eighth Amendment claim requires that there be an objectively serious medical need. The evidence in the record shows that White had diabetes, neuropathy, shoulder pain and chest pain. The evidence suffices to raise a triable issue of fact as to the existence of objectively serious medical needs.

B.      Deliberate Indifference?

When, as here, the prisoner seeks damages against a defendant, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988). Leer explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages." Id. In the former case, a broader and more generalized approach to causation is taken. Id.

> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant…Sweeping conclusory allegations will not suffice to prevent summary judgment…The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

Id. at 633-34 (citations omitted) (emphasis added). A defendant thus would not have exposure for every shortcoming in the medical department at the prison, but only if he personally was deliberately indifferent.

Defendants have met their burden on summary judgment of showing the absence of evidence that they acted with the deliberate indifference necessary for an Eighth Amendment violation. Even viewing the evidence in the light most favorable to White (as the non-movant), no reasonable juror could conclude that any of the defendants knew that White faced a substantial risk of serious harm and disregarded it.

Before turning to the particular claims, the court considers White's argument that Dr. Kasawa's declaration should be rejected as inadmissible hearsay, as improperly describing what nurse Carnes did, and as being "unsubstantiated." Opposition, pp. 1, 5. The medical records attached to Dr. Kasawa's declarations were properly authenticated as business records by the custodian of records declaration. See Kasawa Decl., Exh. A at 001. The hearsay rule does not make the medical records inadmissible. See Fed. R. Evid. 803(6). Insofar as Dr. Kasawa describes what nurse Carnes did, his statements interpret the medical records and have citations

1  to the pages in the records that correspond to his interpretive statements.  The treating doctor was

2  qualified to interpret the patient's medical records, even if he did not make every entry therein.

3  White's assertion that Dr. Kasawa's declaration was "unsubstantiated," Opposition, p. 6, is

4  wholly meritless.  As one licensed to practice medicine and board-certified in family medicine,

5  Dr. Kasawa is qualified to speak to medical issues and to White's medical care.

6

7          1.    Insulin And The Diabetes Care

8          It is undisputed that Dr. Kasawa stopped White's insulin in March 2007 and that the

9  insulin was not restarted until December 2007.  However, it also is undisputed that in March

10 2007, White had blood glucose levels that were so low that they were life-threatening.  The

11 undisputed evidence also shows that, over the next several months, Dr. Kasawa was trying to

12 adjust White's medicines to reduce the number of medicines he took and to reduce adverse

13 effects.  When Dr. Kasawa stopped the insulin, White's diabetes was not left untreated, but was

14 addressed with two or three other anti-diabetic medicines instead of insulin.  The dosages of the

15 anti-diabetic medicines were adjusted in response to the changes in White's blood sugar levels.

16 The effort to control the diabetes with oral medications was within the standard of care in the

17 medical community.  The insulin was restarted in December 2007 by Dr. Mack, who apparently

18 took over White's care after Kasawa stopped being White's primary care physician.  Notably,

19 Dr. Mack did not immediately restart the insulin, but also first tried adjusting the Glipizide and

20 Metformin oral medications, and only restarted the insulin six weeks later when White's blood

21 sugar levels increased.

22         White has presented evidence that certainly would allow a reasonable trier of fact to

23 conclude that he did not think he should be without insulin and that he requested repeatedly to

24 be put back on insulin.  Yet that evidence only establishes a patient's disagreement with his

25 medical care provider.  White had to show that the course of treatment Dr. Kasawa chose was

26 "medically unacceptable under the circumstances" and that he chose to try oral anti-diabetics

27 instead of insulin "in conscious disregard of an excessive risk to plaintiff's health."  Jackson, 90

28 F.3d at 332.  White came nowhere near making such a showing.

14

The evidence indicates that controlling the diabetic's blood sugar level is an ongoing process, the goal of which is to keep the blood sugar level in a desirable range and prevent it from going too high or too low.  Extremely high blood sugar can be damaging; extremely low blood sugar can be life-threatening.  White's opposition simply ignores the evidence that he had life-threateningly low blood sugar levels on several occasions in March 2007.  It is undisputed that giving him insulin during these episodes of hypoglycemia would have been harmful to him.  White argues that Dr. Kasawa's elimination of his insulin was damaging because his blood sugar levels rose.  Even though the insulin was not restarted until December 2007, in the intervening months, Dr. Kasawa prescribed two or three anti-diabetic agents, at least one of which lowered blood glucose levels.

White argues that he has shown a triable issue of fact as to whether he had insulin-dependent diabetes (i.e., type 1 diabetes) based on the conflicting statements from him and Dr. Kasawa.  He has not raised a genuine issue of material fact.  First, he has not shown that the diagnosis of type 1 versus type 2 is something within the ken of a layperson.  A layperson may be able to relay what he has been told by a health care provider, but White has not shown that a layperson could make the determination on his own.  Second, White has not produced any medical documentation showing a diagnosis of type 1 diabetes, notwithstanding the fact that the court told him of several ways to obtain such documentation if the type of diabetes mattered.[3]  Third, even if White thought he had type 1 diabetes, it is not his knowledge but the knowledge of the defendant that matters in an Eighth Amendment analysis.  White presents no evidence that Dr. Kasawa knew White had type 1 diabetes.  The undisputed evidence is that Dr. Kasawa

---

[3]Several months ago, plaintiff sought to continue the motion for summary judgment to do discovery to refute defendants' assertion that he was a type 2 diabetic.  The court denied the motion to continue and explained to plaintiff that, if the type of diabetes made a difference, plaintiff had alternative sources other than defendants to prove the type of diabetes he had.  "[P]laintiff is out of custody and should be able to obtain information about whether he is insulin-dependent or non-insulin-dependent from a medical care provider who currently cares for his diabetes-related problems or from a medical care provider who cared for the problems before he went to prison."  Order Staying Discovery and Extending Deadlines, p. 2.  Even though he had more than a month to obtain the information from an outside health care provider, he did not do so.  Further, before discovery was stayed, White had requested and received document productions from defendants that included his medical records.

1  thought White had type 2 diabetes.[4]

2     White argues that he was not provided medical care on a schedule consistent with a

3  program for chronic medical care patients at the prison.  But that alone does not show or allow

4  an inference of deliberate indifference.  The Eighth Amendment is not so mechanical that it is

5  simply a matter of following a program set by prison officials to manage the hundreds or

6  thousands of prisoner-patients with chronic health problems.[5]  Indeed, several of White's

7  allegations of deliberate indifference concern the alleged failure to see him on a basis other than

8  his scheduled chronic care appointments.

9     On the undisputed evidence in the record, no reasonable jury could find that Dr. Kasawa

10  was deliberately indifferent in stopping the insulin and trying several alternative anti-diabetic

11  drugs to try to control White's diabetes in the ensuing months.

12

13     2.     Neurontin

14     The parties agree that Dr. Kasawa reduced White's Neurontin from 800 milligrams three

15  times per day to 600 milligrams three times per day.  White contends that the reduction caused

16  him needless increased pain.  Because the parties disagree as to whether White complained of

17  increased pain, the court accepts as true non-movant White's version, i.e., that he did complain.

18  It is undisputed that White was taking numerous medicines – the list on March 19, 2007 shows

19  at least 16 different medications[6] – and Dr. Kasawa was trying to reduce White's exposure to

20  _____

21     [4]If Dr. Kasawa was wrong, that would be at most negligence.  Negligence does not rise
   to the level of an Eighth Amendment violation.  See McGuckin, 974 F.2d at 1059.  Further,
22  White would have to show that the distinction between type 1 and type 2 mattered – if the
   difference is that a type 1 diabetic cannot go without insulin at all, as White suggests, even the
23  charts he submitted from the last three months do not show skyrocketing insulin levels, but
   instead show only gradually rising insulin levels six months after the insulin was stopped.
24
      [5]The court explained in its order of service that if White wanted to complain about a
25  perceived failure of prison officials to comply with the rulings in Plata v. Schwarzenegger, No.
   C 01-1351 TEH, a class action concerning medical care in California's prisons, he could contact
26  the plaintiff's class counsel in Plata.

27     [6]This list did not include any medicines prescribed by the mental health care providers.
   The record does not specifically indicate what psychotropic medicines White took, but he
28  apparently was on one or more.  Dr. Kasawa advised him to speak to his psychiatrist "about
   options to his current anti-psychotic medications" and one of his mental health records noted that

1    multiple medications and the possible adverse reactions by slowly decreasing the Neurontin

2    dosage. Dr. Kasawa did not completely stop the Neurontin, but only reduced it by 25% and did

3    so with a medical purpose in mind. White has not shown that the course of action Dr. Kasawa

4    chose was medically unacceptable under the circumstances and chosen in conscious disregard

5    of an excessive risk to his health. See Jackson, 90 F.3d at 332.

6         White particularly takes offense at Dr. Kasawa's decision to "crush and float" the

7    Neurontin, which he states was done as punishment because he complained about the reduction

8    in the pain medications. The evidence is undisputed that the efficacy of Neurontin is not

9    affected by crushing and floating it. It made no medical difference to White whether he received

10   the Neurontin in pill form or in liquid form. Further, the evidence is undisputed that the

11   crushing and floating of medicine was consistent with a policy that existed or was being

12   implemented at the prison. See Kasawa Decl., ¶ 22; docket # 29-1 at 14-15 (inmate appeal

13   response discussing crush and float policy). At most, crushing and floating the Neurontin meant

14   that White lost the opportunity to misuse the medicine, but that loss is not one the law protects.

15        On the evidence in the record, no reasonable jury could conclude that Dr. Kasawa's

16   choice to lower the dosage of Neurontin and to have it delivered in crushed and floated form was

17   medically unacceptable and that Dr. Kasawa chose this course in conscious disregard of an

18   excessive risk to White's health.

19

20        3.    Cardiac Consult

21        White claims that Dr. Kasawa failed to follow up on nurse practitioner Bey's March 19,

22   2007 request for a cardiac consult and that Dr. Lee failed to approve the request. The evidence

23   shows a long delay in providing White with the cardiac consultation that was first requested by

24   nurse practitioner Bey and later by Dr. Mack. However, White's claim fails as a matter of law

25   because there is absolutely no evidence that the 13-month delay resulted in any harm to him.

26        The subjective prong of a deliberate indifference claim requires a showing of "(a) a

27

28   ─────────────────

he was taking Trazodone. See Kasawa Decl., ¶ 12; docket # 28 at 3.

17

1    purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm

2    caused by the indifference." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); McGuckin, 974

3    F.2d at 1060.[7]  The evidence is undisputed that the nuclear cardiology study performed in May

4    2008 showed normal results, and that the cardiologist did not make any follow-up

5    recommendations.  White has not raised a triable issue of fact that he suffered any harm from

6    the alleged indifference of failing to make the cardiac consultation happen sooner.  The evidence

7    that he experienced chest pain does not show harm as a result of the delay in obtaining the

8    cardiac consultation because the cardiac consultation did nothing to change the chest pain.

9    White's chest pain was addressed with nitroglycerine before and after the cardiac consult.  The

10   evidence is undisputed that White's chest pains were not ignored by medical staff: Dr. Kasawa

11   or some other doctor prescribed nitroglycerine to address White's chest pains and prescribed two

12   other medicines to attempt to lower White's blood pressure and consequently alleviate his chest

13   pains.  White also was given an EKG test that, like the nuclear cardiology study, had normal

14   results.  White's evidence that he was emotionally upset by the delay does not raise a triable

15   issue on the harm requirement because the evidence shows that the cardiac consultation was

16   ordered for possible heart problems and there is no evidence it was ordered to improve his

17   mental health.

18

19        4.    Nurse Carnes' Responses To Complaints of Pain And Requests For Care.

20   White claims that nurse Carnes was deliberately indifferent because he failed to place

21

22        [7]The Ninth Circuit puts the requirement that the delay cause harm in the subjective prong
23   of the Eighth Amendment analysis.  Several other circuits put the requirement that the delay
     cause harm in the objective prong.  See, e.g., Napier v. Madison County, 238 F.3d 739, 742 (6th
24   Cir. 2001); Langston v. Peters, 100 F.3d 1235, 1240 (7th Cir. 1996).  Further, those other circuits
     do not accept a plaintiff's ipse dixit assertion that a delay has been harmful and instead require
25   him to prove it with verifying medical evidence.  See, e.g., Napier, 238 F.3d at 742  ("[W]e
     follow the approach taken by the First, Third and Eleventh Circuits.  Specifically, we adopt the
26   holding in Hill that '[a]n inmate who complains that delay in medical treatment rose to a
     constitutional violation must place verifying medical evidence in the record to establish the
27   detrimental effect of the delay in medical treatment to succeed'"); Langston, 100 F.3d at 1240
     ("we agree with the Eighth Circuit that '[a]n inmate who complains that delay in medical
28   treatment rose to a constitutional violation must place verifying medical evidence in the record
     to establish the detrimental effect of delay in medical treatment to succeed.'")

1  White on a "doctor's line" and left White suffering and in pain.  The medical records the parties

2  submitted showed that, rather than act with indifference, nurse Carnes took steps in response to

3  each of White's requests for medical care.  Nurse Carnes contacted doctors as needed and

4  referred White for appointments in response to his requests.  On two occasions, nurse Carnes

5  immediately contacted a doctor when he noticed that White's blood sugar levels had increased.

6  On another occasion, nurse Carnes immediately contacted a doctor when White had an infected

7  toe.  And on another occasion, nurse Carnes immediately contacted a doctor about complaints

8  of chest pain which led to an EKG that day.  The medical records also show that nurse Carnes

9  responded to complaints of shoulder pain – in some instances setting appointments, and in some

10 instances giving White medicines such as acetaminophen on or about September 25, 2007,

11 naproxen sodium on October 9, 2007, acetaminophen on February 25, 2008, and acetaminophen

12 on July 9, 2008 (that apparently was replaced with Celebrex).  Kasawa Decl., Exh. A at 027,

13 031, 041, and 052-053.  In light of the evidence presented by defendants of the specific written

14 requests White submitted and Carnes' responses thereto, White's statements that Carnes did not

15 put him on the doctor's lines on unidentified dates does not raise a triable issue of fact that

16 Carnes acted with deliberate indifference in response to White's requests for medical services.

17

18         5.    Dr. Lee

19         White also has failed to raise a triable issue of fact on his claim that Dr. Lee was

20 deliberately indifferent to his medical needs.  It is undisputed that Dr. Lee did not treat White.

21 His liability would stem and his liability would stem only from his actions as the chief medical

22 officer and membership on any committee that ruled on the request for a cardiac consult – a

23 membership that White has not shown.

24         A supervisor may be liable under section 1983 upon a showing of personal involvement

25 in the constitutional deprivation or a sufficient causal connection between the supervisor's

26 wrongful conduct and the constitutional violation.  Redman v. County of San Diego, 942 F.2d

27 1435, 1446 (9th Cir. 1991) (en banc) (citation omitted).  Because there were no constitutional

28 violations by the supervised persons, White cannot show the necessary causal connection

between any of Dr. Lee's acts as supervisor and a constitutional violation.

A prison official who receives an inmate appeal complaining of an ongoing serious risk to an inmate's health might be liable under the Eighth Amendment if he is in a position to abate the risk and fails to do so. See Jett, 439 F.3d at 1098. The evidence does not show a factual basis for such liability here. Specifically, there was no deliberate indifference by the treating doctor and nurse as described above. The treating doctor had made a decision to try oral anti-diabetics instead of insulin for the patient and had made a decision to taper the amount of Neurontin for the patient who was on numerous medications. The nurse had responded to his complaints of pain, chest pains and elevated blood sugars. Since White has failed to raise a triable issue of fact that there was an ongoing Eighth Amendment violation, he also fails to show that Dr. Lee knew of and disregarded a serious medical need as he responded to White's inmate grievances. As to any delay in the cardiac consult, White's Eighth Amendment claim fails because the delay caused him no harm as explained above.

When the evidence is viewed in the light most favorable to White, and inferences therefrom drawn in his favor, no reasonable jury could return a verdict for him and against defendants. Defendants therefore are entitled to judgment as a matter of law on the Eighth Amendment claim.

C.      Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. The court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. See id. If, however, "a violation could be made out on a favorable view of the parties'

submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Although Saucier required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case. See Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

The first step under Saucier is to determine whether a constitutional violation was alleged. As shown in the preceding sections, the evidence in the record does not establish a violation of White's Eighth Amendment rights. Defendants prevail on the first step of the Saucier analysis, so the court need not proceed to the second step of the Saucier analysis. Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 16.) Defendants are entitled to judgment as a matter of law on the merits of the Eighth Amendment claims and on their defense of qualified immunity. Judgment will be entered in all defendants' favor and against plaintiff. The clerk will close the file.

IT IS SO ORDERED.

Dated: March 17, 2010

_____
SUSAN ILLSTON
United States District Judge